UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KELLY ANN MAYO, an Incapacitated
Person, by and through her Father,
JOSEPH F. MAYO, as Special Guardian
of the Property of, KELLY ANN MAYO,

           Plaintiffs,         No. 07-cv-823
                                         (GLS-DRH)
      v.

COUNTY OF ALBANY and CORRECTIONAL
MEDICAL SERVICES, INC.,

           Defendants.
_____

**APPEARANCES:**

**FOR THE PLAINTIFFS:**

DUPEE, MONROE LAW FIRM        JAMES E. MONROE, ESQ.
30 Matthews Street                     JON C. DUPEE, JR., ESQ.
P.O. Box 470
Goshen, New York 10924

**FOR THE DEFENDANTS:**

**County of Albany**
NAPIERSKI, VANDENBURGH       SHAWN F. BROUSSEAU, ESQ.
LAW FIRM
296 Washington Ave. Extension
Albany, New York 12203

**Correctional Medical Services, Inc.**
THUILLEZ, FORD LAW FIRM       DEBRA J. YOUNG, ESQ.

| | |
|---|---|
| 20 Corporate Woods Boulevard<br>6th Floor<br>Albany, New York 12211-1715 | WILLIAM C. FIRTH, ESQ. |

**Gary L. Sharpe**
**U.S. District Judge**

## DECISION AND ORDER

Following her attempt to commit suicide, plaintiff Kelly Ann Mayo, through her father, brought suit against defendants County of Albany (the "County") and Correctional Medical Services, Inc. ("CMS")[1] claiming, among other things, deliberate indifference, pursuant to 42 U.S.C. § 1983, as well as state law claims for breach of contract and negligence. Defendants have moved for summary judgment and plaintiff has responded with a cross-motion for summary judgment. Following review of the parties' briefs, the responses, the law and the record on the matter, the court grants the County and CMS's motions for summary judgment and denies Mayo's motion for summary judgment.

## BACKGROUND

The following relevant facts are undisputed. On May 13, 2006, Mayo was booked into the County's correctional facility after being charged with

---

[1] Initially, Mayo also filed suit against several other individuals. However, those individuals were later dismissed pursuant to a stipulation by the parties. (See Dkt. No. 58.)

2

Criminal Possession of a Controlled Substance.  (Mayo's Statement of Material Facts at ¶ 1, Dkt. No. 59-3, and Ex. E, Dkt. No. 51-8.)  On the same date, at 2:30 A.M., Mayo was administered a suicide prevention screening by Officer Mark Charette.  (Mayo's Statement of Material Facts at ¶ 2, Dkt. No. 59-3.)  During the suicide screening, Mayo indicated that it was her first incarceration, that she had a history of heroin abuse and had last used heroin the day before, and that she was worried about major problems other than her legal situation.  (Id. at ¶ 3.)  Officer Charette concluded Mayo was not a suicide risk.  (Id. at ¶ 4.)  Officer Charette then referred Mayo for a medical evaluation.  (Id. at ¶ 5.)  Pursuant to a contract with the County, pre-trial detainees receive services by CMS.  (Id. at ¶ 6.)

On May 13, 2006, at 3:15 A.M., Mayo was examined by Debra Vogel R.N., a nurse employed by CMS.  (Id. at ¶ 9.)  As part of her medical history and screening, Mayo advised Vogel that she had experienced withdrawal problems on prior attempts to quit drugs and that she took a medication named Subutex.[2]  (Vogel's Deposition at p. 19-20, Dkt. No. 51-17.)  Vogel then spoke to Dr. Michael Salzman regarding Mayo's medical

---

[2]"Subutex is an opioid (narcotic) . . . to help prevent withdrawal symptoms in someone who has stopped taking narcotics []." See http://www.drugs.com/cdi/subutex.html.

3

evaluation. (Mayo's Statement of Material Facts at ¶ 11, Dkt. No. 59-3.) Dr. Salzman gave telephone orders to place Mayo on a heroin/alcohol detoxification regime. (Id. at ¶ 12.)

Mayo was housed in the infirmary in cell number one and placed on active supervision. (Id. at ¶ 14.) Active supervision requires that an officer conducts a personal observation of the inmate every 30 minutes and is immediately available to respond to emergencies. (Mooney's deposition at p. 53, Dkt. No. 51-14.) On May 15, 2006, Mayo was the only inmate housed in the infirmary. (Mayo's Statement of Material Facts at ¶ 15, Dkt. No. 59-3.) Cell number one is the cell located nearest the infirmary. (Id. at ¶ 18.) In the infirmary, the nurses conduct rounds of the inmates every two hours. (Vogel's deposition at p. 27, Dkt. No. 51-17.) The charge nurse was to determine if additional supervision was warranted for an inmate housed in the infirmary. (Cooper's deposition at 44, Dkt. No. 51-20.) No additional supervision was requested concerning Mayo. (Vogel's deposition at 51-52, Dkt. No. 51-17.)

When an inmate is housed in the infirmary, CMS nurses could request a mental health referral and constant observation, if necessary. (Id.) At the time of the incident, CMS did not request to increase the level

4

of supervision for Mayo nor did it request a mental health evaluation of Mayo.  (Id.)

Mayo's detoxification flow sheet revealed that on May 15, 2006, at 6:30 A.M., she was suffering from tremors, agitation and visual hallucinations.  (Mayo's Statement of Material Facts at ¶ 36, Dkt. No. 59-3.)  She complained to Nurse Laventure that she was seeing gnats.  (Id.)  Dr. Salzman, subsequent to this report, examined Mayo and documented that she appeared stable.  (Ex. W at ¶ 3, Dkt. No. 54-26, Ex. S at ¶ 18, Dkt. No. 54-22, and Ex. C, Dkt. No. 54-6.)  Later that day, Officer Shannon Marshal ("Officer Marshal"), the officer working in the medical unit at the time who performed rounds in the infirmary, checked on Mayo every 30 minutes beginning at 3:00 P.M.  (Marshall's deposition at pp. 49, 58-63, Dkt. No. 51-15.)  Officer Marshall reported seeing Mayo standing by her door at 3:00 P.M., 3:30 P.M., 4:00 P.M. and 4:30 P.M.  (Id.)  At 4:41 P.M., Officer Marshall found Mayo hanging in her cell by a bed sheet.  (Id. at pp. 62-63.)  As a result of her attempted suicide, Mayo suffered permanent brain damage.  (Mayo's Statement of Material Facts at ¶ 51, Dkt. No. 59-3.)

Mayo, through her father, has brought this civil rights action claiming, among other things, deliberate indifference, as well as state law breach of

5

contract and negligence. Defendants moved for summary judgment and Mayo responded with a cross-motion for summary judgment.[3]

## DISCUSSION

To defeat a summary judgment motion, the nonmoving party must show sufficient evidence to create a genuine issue of material fact. *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004). The nonmoving party must provide more than a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). In other words, the party must present sufficient evidence to permit a reasonable juror to find in its favor, but the nonmoving party cannot simply rely on unsupported allegations in attempting to survive a summary judgment motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

### I. Deliberate Indifference

"A municipality may be sued under 42 U.S.C. § 1983 for the

---

[3]The court notes that defendants asked the court to grant summary judgment in their favor because plaintiff failed to comply with Local Rule 7.1(a)(3). Plaintiff subsequently filed the proper statement of material facts. However, exercising its inherent discretion to decide when departure from its local rules should be excused or overlooked, and in the interest to resolve the merits of the pending motions, the court will deny defendants' request and accept the plaintiff's filing (Dkt. No. 66.). As a result, defendants' objections to the belated filing by the plaintiff are overruled.

6

constitutional violations of its employees occurring pursuant to an official policy or custom." *Ramos v. City of New York,* 298 Fed.Appx. 84, 86 (2d Cir. 2008) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692 (1978)). However, under *Monell,* "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat Superior or vicarious liability will not attach under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). Thus, *Monell* liability exists only if a policy or custom of the municipality inflicts injury. *Id.* Moreover, a private corporation also is liable under Section 1983 for its own unconstitutional policies or customs. *Rojas v. Alexander's Dept. Store, Inc.,* 924 F.2d 406, 408 (2d. Cir. 1990).

"The rights of one who has not been convicted are protected by the Due Process Clause." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir. 1996). "Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.* The Supreme Court explained that:

> [I]n order to establish deliberate indifference, a plaintiff must

7

> show *something more than mere negligence;* but proof of intent is not required, for the deliberate indifference standard is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result.

*Id.* (citations, internal quotations omitted, and emphasis added).

Accordingly, the court's "first inquiry . . . is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton,* 489 U.S. at 385.

Mayo contends the procedures followed by defendants violated state law 9 N.Y.C.R.R. 7003.3(h) and Chairman's Memorandum No. 17-99, which outlines the requirements of this state statute. Memorandum No. 17-99 states that:

> [Section 7003.3(h)] requires the facility administrator or designee and/or the facility physician to make a determination as to whether an inmate's condition, illness, or injury warrants additional supervision. This means that either or both the jail administrator/designee and/or jail physician can make such a determination, and that such a determination must be made when an inmate's condition, state of health, or bodily integrity is other than normal. There is an affirmative duty to do so. The same subsection requires the chief administrative officer to order the additional supervision if it is determined to be warranted. Neither duty may be waived.

(Ex. C, Dkt. No. 51-6.)

Putting aside the fact that "Section 1983 provides no remedy for

8

failure to meet state law requirements[]" because "[i]t is only when municipal policy fails to meet federal constitutional or statutory standards that § 1983 liability may be imposed[,]" *Novack v. County of Wood,* 226 F.3d 525, 532 (7th Cir. 2000) (citing *City of Oklahoma City v.Tuttle,* 471 U.S. 808, 816 (1985)), the court determines Mayo has presented no evidence that indicates defendants' conduct was contrary to this memorandum's standards or any other standard. Most importantly, Mayo has presented no evidence that indicates defendants' conduct constituted deliberate indifference.

    Claiming otherwise, Mayo states defendants' policy– to check detoxifying inmates three times per day for five days– is applied to all detoxifying inmates regardless of their individual needs. Here, however, the record reflects Mayo's individual needs were evaluated before she received any medical services. The record reflects that Officer Charette Mayo administered to Mayo a suicide prevention screening. Officer Charette then referred Mayo to Nurse Vogel for a medical examination. Vogel subsequently contacted Dr. Salzman who, by telephone, prescribed medication to Mayo for her alcohol and drug withdrawal. Contrary to Mayo's assertion, the fact that Dr. Salzman did not see Mayo in person, at

9

this point, does not constitute deliberate indifference.

Mayo contends that, at one point, her flow sheet reports she was suffering from tremors, agitation and visual hallucinations, thus, she should have been placed under constant supervision. However, the record indicates that Dr. Salzman, subsequent to this report, examined Mayo and he documented that she appeared stable. (Ex. W at ¶ 3, Dkt. No. 54-26, Ex. S at ¶ 18, Dkt. No. 54-22, and Ex. C, Dkt. No. 54-6.)

Mayo also presented an affidavit from an expert witness, Dr. William B. Head, which states: "that in light of the fact that Ms. Mayo was suffering from alcohol withdrawal and heroin withdrawal and in consideration of Ms. Mayo being a known risk for suicide, suicide precautions should have been taken." (Dr. Head's affidavit at ¶ 11, Dkt. No. 59-4.) However, Dr. Head's opinion is baseless. Nothing in the record indicates Mayo was suicidal. The evidence indicates Mayo received a suicide screening and a medical evaluation, and these two assessments contained no indication that Mayo was a suicide risk. Furthermore, during Mayo's supervision, she was not behaving in a manner that would have alerted the staff that she was at risk of committing suicide.

Deliberate indifference requires that a prison official knows of and

disregards a substantial risk of serious harm to an inmate's health or safety. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The deliberate indifference standard is a subjective one, thus, that there existed a danger of which a prison official objectively should have been aware is insufficient. *Id.* "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Here, viewing the entire record, it is clear that Mayo was suffering from a serious medical need (withdrawal from alcohol and drugs), but there is no evidence indicating that CMS or the County were deliberately indifferent to her needs. Nothing in this record indicates that the defendants actually knew of a substantial risk that Mayo might commit suicide and that they responded with deliberate indifference.

Mayo contends this case is similar to *Liscio v. Warren,* 901 F.2d 274 (2d Cir. 1990). The court, however, disagrees. The facts in *Liscio* are clearly distinguishable from the case at hand. In *Liscio,* the inmate was "behaving in a bizarre manner." *Id.* at 275. The inmate failed to disclose all of his addictions and the nurse noted the inmate was a "'poor historian' of his condition." *Id.* The inmate was placed on restraints because of his "aggressive behavior" and the record indicated "he was repeatedly yelling

11

and talking to himself." *Id.*  The inmate's doctor referred him to a psychiatrist who refused to evaluate the inmate and referred him back to the doctor who, in turn, examined the inmate three days later. *Id.*

Here, none of these events occurred.  Mayo's behavior differed from that of *Liscio,* Mayo was not restrained, Mayo did not hide her alcohol withdrawal[4] (she received treatment for this), and no evidence indicates the defendants perceived that Mayo was a "poor historian" of her condition or that Mayo had previously contemplated suicide.  (Ex. S. at ¶ 16, Dkt. No. 54-22.)  In fact, when asked, Mayo stated she had never considered or attempted suicide.  The fact that the defendant was a "poor historian" was key to the court's reversal in *Liscio.*  The *Liscio* court noted: "[s]ince the medical record indicated that Liscio was a 'poor historian' of his own condition, [the physician] was on notice that Liscio might be suffering from ailments other than withdrawal from the heroin addiction Liscio mentioned when first booked."[5]  *Id.* at 276.  As the Eleventh Circuit noted, "§ 1983

---

[4]The court notes, as defendants do, that Mayo refers to her alcohol withdrawal as "severe" throughout her brief.  However, the record does not indicate that her withdrawal was labeled as "severe" by any medical staff, including her own expert.

[5]Mayo also cites *Archer v. Dutcher,* 733 F.2d 14 (2d Cir. 1984).  However, in *Dutcher,* plaintiff had made several requests for medical attention and was forced to attend a hearing despite complaints that she was in pain.  As a result of defendants' delay in *Dutcher,* plaintiff miscarried.  Here, Mayo made no requests that were ignored.

12

requires that the defendant have 'notice of the suicidal tendency of the individual whose rights are at issue in order to be held liable for the suicide of that individual.'" *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1105 (11th Cir. 2005) (internal citation omitted).

### II. Negligence

"Under New York law, the elements of a negligence claim are (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 215 (2d Cir. 2002) (citations omitted). However, "the scope of the State's duty to protect inmates is limited to risks of harm that are reasonably foreseeable." *Sanchez v. State of New York,* 99 N.Y.2d 247, 253 (2002). Under New York law, an inmate must show that prison authorities know or should know of a suicidal tendency to incur a duty of care to prevent a prison suicide. *Gordon v. City of New York,* 70 N.Y.2d 839, 840 (1987).

With these precepts in mind, the court determines that Mayo has failed to show that defendants knew or should have known that she would commit suicide. Nothing in the record indicates that Mayo's attempted

13

suicide was foreseeable.

As previously indicated, Mayo was screened twice and neither screening indicated she was suicidal. The record indicates she was given medications for her drug and alcohol withdrawals. Mayo was also seen by the prison staff several times the day of the incident. Dr. Salzman reported she was stable the day of the incident and at no point, after Salzman saw her, did she exhibit any behavior that would have alerted the prison authorities that she was suicidal. The defendants could not have reasonably perceived the risk that Mayo would attempt suicide nor can it be said that defendants acted unreasonably by not treating her as a suicide risk. As a result, defendants had no duty to prevent the unforeseeable, and summary judgment will be granted in their favor with respect to this claim.

### III. Breach of Contract

Under New York law,

> "A party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost."

*Madeira v. Affordable Hous. Found., Inc.,* 469 F.3d 219, 251 (2d Cir. 2006)

14

(citing *State of Cal. Pub. Employees. Ret. Sys. v. Sherman & Sterling,* 95 N.Y.2d 427, 434-35 (2000) (internal citation and quotation marks omitted)).

Here, there is no doubt that Mayo was a third party beneficiary. In fact, defendants agree that she was a beneficiary. However, Mayo has provided no evidence that indicates there was a breach of contract. As previously indicated, Mayo was medically evaluated, she was seen by Dr. Salzman, and she was prescribed medication for her drug and alcohol withdrawals. (Vogel's deposition at pp. 28-33, Dkt. No. 51-17, and Ex. S at ¶ 7, Dkt. No. 54-22.) Mayo contends a breach exists because she should have been placed under constant supervision when she was suffering from tremors, agitation and visual hallucinations, thus, CMS failed to provide proper care. She also contends CMS's care failed to comply with the law, i.e., the Chairman's memorandum stated above. However, the record indicates that Dr. Salzman, subsequent to this report, examined Mayo and he documented that she appeared stable. (Ex. W at ¶ 3, Dkt. No. 54-26, Ex. S at ¶¶ 11, 12, and 18, Dkt. No. 54-22, and Ex. C, Dkt. No. 54-6.) In addition, nothing in the record indicates CMS's procedures violated any law or standard. CMS has provided ample expert testimony supporting this

determination.[6]  (Ex. S at ¶¶ 22-28, Dkt. No. 54-22.)  As a result, summary judgment in favor of defendants is appropriate.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the motions for summary judgment by the County (Dkt. No. 51) and CMS (Dkt. No. 54) are **GRANTED** and Mayo's motion for summary judgment (Dkt. No. 59) is **DENIED**; and it is further

**ORDERED** that the Clerk enter judgment and provide copies of this Decision and Order to the parties.

**IT IS SO ORDERED.**

Albany, New York
Dated: April 3, 2009

*/s/ Gary L. Sharpe*
United States District Court Judge

---

[6]Mayo argues summary judgment is inappropriate in light of *Noseworthy v. City of New York,* 298 N.Y. 76, 80 (1948), under which a wrongful death plaintiff in New York is not held to the high degree of proof required in a case where the injured person may testify and give her version of the events.  However, *Noseworthy* is inapplicable to this case.  The purpose of the *Noseworthy* rule "is to circumvent the situation where a tort-feasor who inflicts personal injury [would] be insulated from liability simply because the injuries produced are fatal . . . and the decedent, who would have been in the best position to describe the event from plaintiff's point of view, [is] unavailable to do so."  *Kazanoff v. United States,* 945 F.2d 32, 35 n.4 (2d Cir. 1991) (internal citation and quotation marks omitted).  Here, *Noseworthy* is inapplicable because the County and CMS were not aware of facts that a substantial risk of serious harm existed.  Furthermore, *Noseworthy* does not relieve Mayo from establishing a prima facie case nor does it diminish her burden of proof.  *Id; see also Mehra v. Bentz,* 529 F.2d 1137, 1140 (2d Cir. 1975).

16